IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES

v.                                        Criminal No. 3:25-cr-99

JAWAD BHATTI,

    Defendant.

**MEMORANDUM OPINION**

This matter is before the Court on DEFENDANT'S OMNIBUS MOTION TO DISMISS THE INDICTMENT AND MOTION TO STRIKE (the "MOTION") (ECF No. 31); MEMORANDUM IN SUPPORT OF DEFENDANT'S OMNIBUS MOTION TO DISMISS THE INDICTMENT AND MOTION TO STRIKE (ECF No. 32); UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS (ECF No. 35); and REPLY IN SUPPORT OF DEFENDANT'S OMNIBUS MOTION TO DISMISS THE INDICTMENT AND MOTION TO STRIKE (ECF No. 36). For the reasons set forth below, the MOTION will be granted as to COUNTS ONE through THREE and denied as to COUNT FOUR and COUNTS FIFTEEN through TWENTY.

**I. FACTUAL BACKGROUND**

Dr. Jawad Bhatti ("Bhatti") was indicted by a Grand Jury on June 17, 2025 on twenty-six counts arising out of an alleged scheme involving the use of ozone therapy machines and ozone treatment at

1

his pain management practice, Healing Hands of Virginia. ECF No. 3 ("Indictment"), ¶¶ 10, 38-49. Bhatti is charged as follows:

    (1) COUNTS 1 through 3 allege violations of 21 U.S.C. §§ 331(c), 333(a)(2) Adulterated and Misbranded Device;

    (2) COUNT 4 alleges a violation of 21 U.S.C. §§ 331(k), 333(a)(2) Misbranded Drug;

    (3) COUNTS 5 through 10 allege violations of 18 U.S.C. § 1347 and 2 Health Care Fraud;

    (4) COUNTS 11 through 14 allege violations of 18 U.S.C. § 1035(a)(2) False Statements Related to Health Care Matters;

    (5) COUNTS 15 through 20 allege violations of 18 U.S.C. § 1347 and 2 Health Care Fraud; and

    (6) COUNTS 21 through 26 allege violations of 18 U.S.C. 1035(a)(2) False Statements Related to Health Care Matters.

Indictment, 1.

The Indictment alleges that, between July and December 2019, Bhatti ordered and received three ozone therapy devices: the OZON 2000, the Hyper Medozon, and the HOCATT. Indictment ¶¶ 38-40. It is said that Bhatti used the OZON 2000 and Hyper Medozon devices

to create ozone gas from oxygen, which he then injected into patients, family members, and the staff of Healing Hands of Virginia. Id. ¶ 41. It is also alleged that Bhatti used the HOCATT ozone immersion machine on patients. Id. ¶ 48. Bhatti's website advertised ozone injections, and ozone gas treatment as resolving or treating a variety of health concerns, including pain, infections, arthritis, and AIDS. Id. ¶¶ 42-45. Ozone is not approved by the Federal Drug Administration ("FDA") for treatment of any medical condition. Id. ¶ 11.

Bhatti is alleged to have extensively administered ozone injections. Id. ¶ 51. Knowing the injections were not FDA approved, Bhatti omitted his use of ozone therapy in patient records, told his staff to only accept payment for the therapy in cash, and falsely billed Medicare and Medicaid for procedures he did not do. Id. ¶¶ 55, 56, 58. The injections caused extreme suffering in his patients, sometimes causing patients to seek emergency care due to seizures, vomiting, migraines, nausea, fainting, and more. Id. ¶ 50.

## II. STANDARD OF REVIEW

On a Motion to Dismiss an indictment, all facts alleged in the indictment are presumed true. United States v. Treacy, 677 F. App'x 869, 873 (4th Cir. 2017). A Motion to Dismiss an indictment is not the appropriate venue to test the evidence. Id. Rather, the

motion may challenge whether the indictment contains the elements, informs the defendant of the charge, and allows the defendant to avoid double jeopardy in subsequent prosecutions. <u>United States v. Kingrea</u>, 573 F.3d 186, 191 (4th Cir. 2009).

### III. DISCUSSION

The MOTION argues COUNTS 1 through 4 should be dismissed for failure to allege facts that could result in a conviction and that COUNTS 15 through 20 should be dismissed for misstatements of law. ECF No. 31, 1. The MOTION further asks that portions of the Indictment (describing agency regulation) be struck so they do not confuse or mislead the jury. <u>Id.</u> However, in Bhatti's reply, he does not pursue the Motion to Strike, instead advising that he will "assert those arguments at a later date." ECF No. 36, 7. In other words, Bhatti concedes that the Motion to Strike was not appropriately brought at this time and withdraws it. Therefore, this Analysis will only address the arguments as they relate to COUNTS 1 through 4 and COUNTS 15 through 20.

#### A. Whether COUNTS 1 through 3 properly allege "delivery" of any device

Bhatti's first argument is that COUNTS 1 through 3 should be dismissed because they do not allege any facts that could support "delivery" of any device as required in 21 U.S.C. § 331(c). ECF No. 32, 1.

4

21 U.S.C. § 331 is contained in the Federal Food Drug and Cosmetic Act ("FDCA") (21 U.S.C. §§ 301 et seq.) 21 U.S.C. § 331(c) prohibits, "The <u>receipt</u> in interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded, and the **delivery or proffered delivery thereof** for pay or otherwise." (emphasis added). The Indictment alleges that Bhatti received three "adulterated" and "misbranded" devices (the OZON 200, Hyper Medozon, and HOCATT devices) in interstate commerce. Indictment ¶ 60. The MOTION does not implicate the misbranded or adulterated aspect of the statute. Nor does it challenge the adequacy of the interstate commerce elements. Rather, the challenge is whether the misbranded devices (the OZON 200, the Hyper Medozon, and the HOCATT) received in interstate commerce were "delivered."

To understand whether the devices were delivered, it is first important to understand what the devices are alleged to do. The HOCATT is an ozone immersion device, meaning patients enter the device and it fills with ozone which is then released into the device. Indictment ¶ 40, 44, 45. The OZON 2000 and Hyper Medozon were used to create ozone that, either alone or with lidocaine, was injected into patients. Indictment ¶¶ 42, 49. Bhatti argues that neither giving injections which contain ozone gas created by an allegedly adulterated device (the OZON 200 and the Hyper

5

Medozon) nor administering treatment using an allegedly adulterated device (the HOCATT) is delivery under the statute.

It is well-established that, absent a statutory definition, statutory language should be given its "ordinary, contemporary, common meaning." Southwest Airlines Co. v. Saxon, 596 U.S. 450, 455 (2022) (internal citations omitted). 21 U.S.C. § 301, the FDCA, does not define the word "delivery." The ordinary meaning of a word is discerned by looking at it in context, not alone. Southwest Airlines Co., 596 U.S. at 455. Additionally, when Congress uses language differently in different parts of the statute, that can indicate different meanings. Sebelius v. Auburn Regional Medical Center, 568 U.S. 145, 156 (2013). So, it is permissible to consider any definition of the term delivery in Title 21. And, in 21 U.S.C. § 802(8) the "terms 'deliver' or 'delivery' mean the actual, constructive, or attempted transfer of a controlled substance or a listed chemical. . . ."[1] However, that definition does not pertain to devices, so it is of marginal utility in analyzing the part of Title 21 that is at issue in the MOTION. So, the analysis properly looks to the ordinary meaning of the term "delivery."

First, dictionary definitions of delivery. The modern dictionary lists meanings such as "the act of delivering

---

[1] That definition is in the Drug Abuse and Control part of the FDCA, See fn. 4, infra.

something," "the act of taking something to a person or place," "the way something is said officially or publicly," and "the way a ball is thrown or released (as in baseball or cricket." "Delivery," Merriam-Webster, https://www.merriam-webster.com/dictionary/delivery [https://perma.cc/4VC9-WT2V]. Dictionaries from the time of enactment of the statute (~1938) have similar definitions. Webster's 1940 Dictionary defined delivery to mean, inter alia, "Act of delivering up or over; surrender; transfer of the body or substance of a thing," and "[t]he transportation of a purchase to a place designated by a purchaser and the transference of it then to the purchaser. . . ." Webster's New International Dictionary of the English Language, 693 (William Allan Neilson, et al. eds., 2nd ed. 1940).[2] Transfer seems to be a rather consistent dictionary meaning of "delivery" that has spanned the time from the enactment of the FDCA to today. None of the common definitions refer to delivery to include giving an injection or administering a medical procedure.

The Government counters that a medical dictionary includes "[t]he provision and administration of a therapeutic agent to a patient." ECF No. 35, 7 (internal citation omitted). Therefore, says the Government, giving an injection can be delivery. However,

---

[2] Similar definitions are found in other contemporaneous dictionaries. See 3 The Oxford English Dictionary, 168-69 (1933); The Practical Standard Dictionary of the English Language, 313 (Frank H. Vizetelly, ed. 1936).

7

the Government cites neither a decision nor rationale to support its use of a specialized medical dictionary instead of a regular English dictionary.

The Supreme Court instructs that, when "a word carries both an ordinary and specialized meaning, we look to context to choose between them." Med. Marijuana, Inc. v. Horn, 604 U.S. 593, 603 (2025). The context of the statute here makes clear that the medical definition is not what was contemplated. What is now § 331(c) was originally codified at 52 Stat. 1042 on June 25, 1938, as § 301(c). The use of the word "delivery" elsewhere in the FDCA makes it clear that the non-medical meaning of the word was used. For example, § 301(a) and (d) refer to the "introduction or delivery for introduction into interstate commerce."[3] Administration of a therapeutic agent to an individual is not contemplated by that statutory context. Moreover, when the same section of the FDCA refers to administration of a drug or treatment to a patient, it uses the word "dispense." 21 U.S.C. § 331(i)(3). Further, the transfer or giving of an item (the standard meaning of delivery) would not be captured by the FDCA if the medical definition did apply. Given the FDCA's focus on interstate commerce and transporting items in interstate commerce, the medical

---

[3] The current sections are identical, 21 U.S.C. §§ 331(a), (d).

definition of delivery would produce a result at odds with the general thrust of the statute.[4]

The Government next argues that the medical use of the word should be included because the FDCA is to be liberally interpreted to protect consumers and because it applies to regulation of drugs used in medicine. ECF No. 35, 7. The "liberal interpretation" argument just does not change the analysis that derives from the ordinary meaning of the statutory text viewed in context of the statutory purpose.

Bhatti takes the view that the Supreme Court has ruled in United States v. Sullivan that 21 U.S.C. § 331(c) is not intended to "'supply protection all the way to the consumer,' or, in this case, the patient." ECF No. 32, 4 (quoting United States v. Sullivan, 332 U.S. 689, 696 (1948)). However, as the Government correctly points out, Bhatti's reading of Sullivan is not supported by the decision itself. Sullivan held that 21 U.S.C. § 321(k) is supposed to "gap-fill" what was not covered by 21 U.S.C. §§ 321(a),

---

[4] The defense also cites 21 U.S.C. § 802(2) which refers to "administer" as "the direct application of a controlled substance to the body of a patient. . .," which, says the defense, means that "delivery" cannot mean the same thing. The reference to 21 U.S.C. § 802(2) is not helpful because the definitions applicable to 21 U.S.C. § 331(c) are contained in 21 U.S.C. § 321, which does not define delivery. § 802 is in Chapter 13, the Drug Abuse Prevention and Control Act, whereas both §§ 321 & 331 are in Chapter 9, the Food, Drug, and Cosmetic Act.

9

(b), and (c) by including drugs or devices which moved in interstate commerce even where the defendant received the drug or device from someone within the state. ECF No. 35, 5 (citing Sullivan, 332 U.S. at 696-97). Sullivan did not say that (a), (b), and (c) provided no protection to consumers. Sullivan, 332 U.S. at 697 (citing House Committee report stating Congress intended to "extend the protection of consumers" (emphasis added)). Rather, it expanded the jurisdictional scope to include when the transaction to the consumer was itself intrastate, not interstate. Id. Sullivan is not instructive.

Thus, using the standard dictionary definition of "delivery," the question now becomes whether either (1) using a device on patients or (2) using a device to create an ingredient in an injection and injecting patients with that ingredient constitutes delivery. The answer to both questions is no. The devices in question here are not given or transferred to patients. Bhatti used the devices directly on patients and administered an injection created in part by the devices on patients, but that is neither giving, transferring, nor any other common meaning of delivery.

Bhatti relies on the decision in United States v. Barnett, 99 Cr. 124, 2000 Dist. LEXIS 9677 (S.D.N.Y. July 12, 2000). In Barnett, the Court held that administering adulterated liquid silicone to patients was not "delivery" of the silicone under 21

10

U.S.C. § 331(c). Id. at *4-5. In Barnett, the actual substance injected into the patients is also the substance alleged to be adulterated. Id. at *3. Therefore, Barnett held that an injection is not a delivery. Barnett was vacated because the parties entered a deferred prosecution agreement. But its rationale is informative.[5] Here, in contrast, the adulterated devices were the machines, not the injections, meaning delivery would have to be stretched even further past what the government asked for and the Court rejected in Barnett.

The Government cites several FDCA cases for the proposition that use of medical devices falls within the FDCA's proscriptions. See ECF No. 35, 3-4. However, those cases do not relate to delivery under § 331(c), or § 331(c) at all. United States v. Device Labeled "Cameron Spitler Amblyo-Syntonizer," 261 F. Supp. 243, 246 (D. Neb. 1966) (holding that a physician using a device was "holding [it] for sale" § 352(f)(1)); United States v. Jackson, 126 F.4th 847, 860 (4th Cir. 2025) (holding that being a physician does not exempt physicians from prosecution under § 331(k)); United States v. Kaplan, 836 F.3d 1199, 1211 (9th Cir. 2016) (holding that a

---

[5] The Government makes much of the fact that Barnett is non-binding and was vacated. ECF No. 35, 1, 6-7. However, as Bhatti notes, the decision was not vacated for a flaw in the reasoning, but because there was a deferred prosecution agreement and the case was ultimately dismissed. See 1:99-cr-124, ECF Nos. 29-31. 3:25-cr-99, ECF No. 36, 4. Barnett was vacated, not overruled.

11

physician re-using a single use device on a patient fell under the "held for sale" language in 21 U.S.C. § 331(k)); United States v. Regenerative Scis., LLC, 741 F.3d 1314, 1319 (D.C. Cir. 2014) (holding that a mixture of bone marrow and other solutions was a "drug" under the FDCA § 331(k)).

Because COUNTS 1 through 3 do not allege delivery, an element of the offense, COUNTS 1 through 3 will be dismissed.

### B. Whether COUNT 4 should be dismissed because the injections themselves were not shipped in interstate commerce.

Bhatti argues that COUNT 4 should be dismissed because the only articles that traveled in interstate commerce were the devices and the allegation in COUNT 4 is that the ozone plus lidocaine injections (the "Injections"), not the device, were mislabeled. ECF No. 32, 4-5. The Government argues that the Indictment alleges that components of the drug, i.e. the lidocaine or medical grade oxygen were transported in interstate commerce, which is sufficient at this stage. ECF No. 35, 8-9.

21 U.S.C. § 331(k) prohibits "doing [] any other act with respect to, a . . . drug . . . if such act is done while such article is held for sale . . . after shipment in interstate commerce and results in such article being adulterated or misbranded." 21 U.S.C. § 321(g)(1)(D) defines "drug" to include "articles intended for use as a component of any article specified in clause (A), (B), or (C)" of the definition of drug. These two

provisions, taken together with the decisional law, teach that, so long as the Indictment alleged that the ingredients of the Injection traveled in interstate commerce, a violation of 21 U.S.C. § 321(k) is sufficiently alleged. Baker v. United States, 932 F.2d 813, 814-15 (9th Cir. 1991); United States v. Dianovin Pharms., Inc., 475 F.2d 100, 103 (1st Cir. 1973); Regenerative Sciences, LLC, 741 F.3d at 1320-21.

The Indictment alleges that the components "of the drug were shipped in interstate commerce," and that the drug is the "Ozone plus lidocaine injection." Indictment ¶ 62. That is sufficient because it alleges the elements of the offense, informs Bhatti of what he is charged with, and allows him to allege double jeopardy if he was tried again. United States v. Kingrea, 573 F.3d 186, 191 (4th Cir. 2009).

Bhatti also argues the Indictment's allegations are not sufficient because it does not allege which component traveled in interstate commerce, nor has much of the discovery Bhatti received shed light on the specific details of what it was that traveled in interstate commerce. ECF No. 36, 5-6. However, those arguments relate to sufficiency of evidence, not infirmities of the Indictment.

Therefore, the MOTION will be denied as to COUNT 4.

## C. Whether interpretation of CPT 76942 is appropriately resolved as a matter of law.

Finally, Bhatti argues that COUNTS 15 through 20 are insufficient as a matter of law because they are based on a factually deficient legal theory. Bhatti says the Government's theory is that using an ultrasound after an injection is per se non-reimbursable under CPT Code 76942. ECF No. 32, 6. He then argues CPT Code 76942 does not require the ultrasound be used to guide the insertion of a needle. Id. Bhatti cites the full language of CPT Code 76942, which states in full, "Ultrasonic guidance for needle placement (e.g., biopsy, aspiration, injection, localization device), imaging supervision and interpretation." Id. Therefore, Bhatti states it "is reasonable to conclude the [grand] jury was improperly instructed on the basis for the indictment." Id.

18 U.S.C. § 1347 prohibits "knowingly and willfully execut[ing], or attempt[ing] to execute, a scheme or artifice – (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses. . . any of the money or property owned by, or under the custody or control of, any health care benefit program." 18 U.S.C. § 1347(a).

In this argument, Bhatti asks the Court to resolve, on a motion to dismiss the Indictment, a factual issue about the meaning of a CPT Code and what is allowed and not allowed to be billed

14

under that code. The Government argues the CPT code does not allow post-injection imaging, Bhatti states it does. The only way to resolve this issue would require expert testimony and reports as to the "usage that prevails among care providers on the ground." <u>United States v. Elfenbein</u>, 144 F.4th 551, 567 (4th Cir. 2025).

Therefore the MOTION will be denied as to COUNTS 15 through 20.

## IV. CONCLUSION

In sum, DEFENDANT'S OMNIBUS MOTION TO DISMISS THE INDICTMENT AND MOTION TO STRIKE (ECF No. 31) will be granted as to COUNTS 1 through 3, denied as to COUNT 4, and denied as to COUNTS 15 through 20.

It is so ORDERED.

/s/ REP
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: December 16, 2025

15