# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA
# RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JAWAD BHATTI,<br><br>*Defendant.* | Case No. 3:25-cr-99 |

## STATEMENT OF FACTS

The United States and the defendant, JAWAD BHATTI, agree that at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

1. The Medicaid program was established by Title 19, Social Security Act of 1965, to provide medical assistance to indigent persons. The United States Department of Health and Human Services and the Commonwealth of Virginia, through the Commonwealth's Department of Medical Assistance Services, administer and supervise the administration of the Medicaid program in Virginia, which is called the Virginia Medical Assistance Program (Medicaid). The federal and state governments jointly provide funding for Medicaid.

2. The Medicare Program (Medicare) is a federal health insurance program, affecting commerce, that provides benefits to persons who are 65 years of age and older or disabled. Medicare is administered by the United States Department of Health and Human Services through its agency, the Centers for Medicare and Medicaid Services.

3. The Federal Employee Health Benefit Program ("FEHBP") is a federally funded health care benefit program provided by the federal government for federal employees, retirees, and their eligible spouses and dependent children. The Office of Personnel Management ("OPM") administers the FEHBP.

1

4. Medicaid, Medicare, and FEHBP are "health care benefit programs" as defined in 18 U.S.C. § 24(b).

5. Individuals who qualify for Medicare or Medicaid benefits are commonly referred to as "beneficiaries." Each beneficiary is given a unique identification number.

6. As part of the Medicare enrollment process, health care providers who provide items or services to beneficiaries submit enrollment applications to Medicare. The Medicare provider enrollment application, CMS Form 855B, requires a provider, or an authorized representative of the provider, to certify that the provider will comply with all Medicare-related laws, rules, and regulations, including that the provider "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare" and "will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

7. As part of the Medicaid enrollment process, providers submit enrollment applications to Medicaid. The Virginia Medical Assistance Program Provider Enrollment Application requires a provider, or an authorized representative of the provider, to certify that the provider will comply with all Medicaid-related laws, rules, and regulations, including that the provider is responsible for reading and adhering to the policies and regulations explained in this manual and for ensuring that all employees do likewise. The provider also certifies by his or her personal signature, or the signature of an authorized agent, on each invoice, that all information provided to the Commonwealth's Department of Medical Assistance Services is true, accurate, and complete. Satisfaction and payment of any claim will be from federal and state funds, and any provider who submits false claims, statements, or documents may be prosecuted under applicable federal or state laws.

8. If Medicare or Medicaid approve a provider's application, these government programs assign the provider a provider number. A provider with a provider number can submit

claims to obtain reimbursement for actually rendered and medically necessary items and services. Providers are given access to manuals and service bulletins describing Medicare and Medicaid procedures, rules, and regulations.

9. Medicare includes coverage under component parts. Medicare Part B covers outpatient medical items and services that are reasonable and medically necessary.

10. When seeking reimbursement from the health care benefit programs for qualifying services rendered by the provider recipient, providers submit the cost of the service provided, together with the appropriate procedure code, as set forth in the Current Procedural Terminology (CPT) Manual or the Healthcare Common Procedure Coding System. The provider must certify that the services claimed were actually provided, medically necessary, and the information included on the claim is accurate.

<u>The Defendant and Healing Hands of Virginia</u>

11. The defendant, JAWAD BHATTI, for the entire relevant period, solely owned and operated Healing Hands of Virginia, a pain management clinic based in Richmond, Virginia, which is in the Eastern District of Virginia.

**OFFENSE CONDUCT**

12. From in or about July 2019, through on or about October 8, 2020, the defendant, JAWAD BHATTI, did manufacture and inject patients with a drug containing ozone gas that was not approved by the FDA.

13. Ozone is "a toxic gas that with no known useful medical application in specific, adjunctive, or preventive therapy." 21 C.F.R. § 801.415. The Food and Drug Administration has not approved the use of ozone to diagnose, cure, mitigate, prevent, or treat disease or to affect the structure or any function of the body. It is illegal to use ozone in medical applications.

3

### A. Federal Regulation

14. The United States Food and Drug Administration (FDA) is the federal agency charged with responsibility for protecting the health and safety of the American public by enforcing the Federal Food, Drug, and Cosmetic Act (FDCA).

15. The FDCA's purposes include ensuring that medical products, including devices and drugs, sold for consumption by or for administration to humans, or for other use by or on humans, are safe, effective, and bear labeling containing accurate and certain required information, as well as adequate directions for their safe use. FDA's responsibilities under the FDCA include regulating the manufacture, labeling, and distribution of all drugs and medical devices shipped or received in interstate commerce. Federal regulations define interstate commerce as commerce between any state or territory and any place outside thereof. 21 U.S.C. § 321(b).

16. The FDCA defines a "drug" to include (1) articles intended to diagnose, cure, mitigate, prevent, or treat disease in man or other animals; or (2) articles intended to affect the structure or any function of the body of man or other animals; or (3) articles used as components of the above. 21 U.S.C. § 321(g)(1)(B), (C), (D).

17. Under the FDCA, the "intended use" of an article means the objective intent of the persons legally responsible for the labeling of that article. This objective intent might, for example, be shown by labeling claims, advertising matter, or oral or written statements by such persons or their representatives. 21 C.F.R § 201.128.

18. Some drugs are "new drugs," which are defined as any drug whose composition is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as being safe and effective for use under the conditions prescribed, recommended, and suggested in the drug's labeling. 21 U.S.C. § 321(p). New drugs require FDA approval before they may be marketed. 21 U.S.C. § 355(a); 21 U.S.C. § 331(d). If

there is no new drug application, an investigational new drug application must be in effect before the drug may be distributed for research purposes. 21 U.S.C. § 355(i); 21 C.F.R. pt. 312.

19. To obtain FDA approval of a new drug application, the drug's sponsor must demonstrate, to FDA's satisfaction, that the drug is both safe and effective for each of its claimed uses. 21 U.S.C. § 355(b). To that end, a sponsor of a new drug must submit: (1) full reports of investigations to establish that the drug is safe and effective; (2) a full list of the drug's components; (3) a full statement of the drug's composition; (4) a full description of the methods, facilities, and controls used to manufacture, process, and pack the drug; (5) samples of the drug and its components; and (6) samples of the proposed labeling for the drug.

20. Some drugs are also "prescription drugs," which are defined as those drugs that, because of their toxicity and other potential harmful effects, or the methods of their use, or the collateral measures necessary to their use, are not safe for use except under the supervision of a practitioner licensed by law to administer such drugs. 21 U.S.C. § 353(b)(1)(A). Prescription drugs have additional regulatory requirements, including that at all times prior to dispensing their label bear at a minimum the symbol "Rx only." 21 U.S.C. § 353(b)(4)(A).

21. Under the FDCA, all drugs also must bear labeling that contains adequate directions for use. 21 U.S.C. § 352(f). "Adequate directions for use" are directions sufficient for a layperson to safely use the drug for the purposes for which it is intended. 21 C.F.R. § 201.5. Directions under which a layperson can safely use a prescription drug cannot be written because such drugs can, by definition, only be used safely at the direction, and under the supervision of, a licensed practitioner, so they must qualify for an exemption to this requirement. The exemption, set out in 21 C.F.R. § 201.100, requires that *all* its conditions be met, including that its labeling bear the symbol "Rx only" and, if it is a new drug, that it bear FDA-approved labeling. *Id.* at (b)(1), (c)(2).

22.     Under 21 U.S.C. § 331(k), it is prohibited to do any act with respect to a drug or device that causes it to become misbranded after it moves in interstate commerce and while it is held for sale. 21 U.S.C. § 331(k).

**B. BHATTI's Use of Ozone Devices to Create Injections Containing Ozone**

23.     On or about July 19, 2019, BHATTI purchased and received in interstate commerce a Hyper Medozon ozone machine from the German manufacturer Herrmann Apparatebau GmbH (HAB). HAB refers in its promotional materials to the Hyper Medozon machine as "medically certified" and represents that medical ozone has "strong bactericidal, virucidal, fungicidal and antiparasitic effect[s]." BHATTI maintained this Hyper Medozon machine in his practice.

24.     In or about August 2019, BHATTI purchased and received in interstate commerce an OZON 2000 ozone machine from the German manufacturer Zotzmann. The OZON 2000 device manufactured ozone gas from medical grade oxygen. BHATTI maintained this OZON 2000 machine in his practice.

25.     From in or about August 2019 until on or about October 8, 2020, BHATTI used the OZON 2000 and the Hyper Medozon machines at his medical practice to create ozone gas from medical grade oxygen and administered that ozone to patients and employees.

26.     Because FDA has determined that "ozone is a toxic gas with no known useful medical application in specific, adjunctive, or preventive therapy," FDA has not approved or cleared any ozone devices to treat any medical condition in the United States. 21 C.F.R. § 801.415.

27.     BHATTI displayed pictures of his ozone machines on his practice's public-facing website and also promoted ozone therapy by listing the purported benefits of injections containing ozone. BHATTI advertised that these purported benefits of an ozone and lidocaine injection included: "helps with infected wounds, repairs circulatory disorders, helps alieve [sic] geriatric disorders, improves macular degeneration, helps fight viral diseases, reduces pain and helps repair

rheumatism and arthritis, fights cancer, treats SARS, and AIDS treatment." BHATTI's website described ozone's "most important[]" application as treating lower back pain, and encouraged patients to "[l]et the front desk know if you need an ozone injection on your next visit."

28. BHATTI made these statements about the medical nature and purposes of the ozone machines to advertise to patients and potential patients BHATTI's intent and willingness to employ these ozone machines to deliver ozone treatments unapproved by FDA and barred by the FDCA. BHATTI did in fact administer drugs containing ozone and lidocaine—a local anesthetic that is FDA-approved— to his patients and other individuals. The lidocaine was manufactured outside Virginia, and thus a component of these injections traveled in interstate commerce.

29. As advertised in their manufacturers' promotional materials, the <u>OZON 2000</u> and the <u>Hyper Medozon</u> ozone machines are typically used to extract a patient's blood, infuse the extracted blood with ozone gas, and pump the blood back into the patient's body. BHATTI, in contrast, favored injecting ozone, using large syringes, directly into his patient's body. In 2019, BHATTI attended a training about ozone therapy in Michigan, and explained to other attendees that his (BHATTI's) practice included directly injecting ozone into his patients. When used in this way, the ozone is a new drug and would require FDA approval.

30. BHATTI caused a drug containing ozone to be misbranded because he manufactured the drug after one or more of its components moved in interstate commerce, and held that drug for sale while failing to properly label it, either by affixing the symbol "Rx only" or using the FDA-approved labeling as required under the FDCA. However, it was impossible for BHATTI to use this latter option of FDA-approved labeling for ozone because the FDA has not approved the use of ozone in medical applications and there is thus no FDA-approved labeling.

31. BHATTI's injections caused immediate and subsequent physical side effects in his patients.

7

32. BHATTI often injected patients with ozone without those patients' informed knowledge and consent, meaning that BHATTI did not tell these individuals what he was injecting into their bodies other than that it was a substance that would alleviate the patients' pain.

33. BHATTI was aware that the use of ozone for medical purposes was not approved by FDA. This lack of FDA approval for the medical use of ozone was discussed at the ozone training in Michigan in 2019, and BHATTI acknowledged to at least one employee in 2020 that BHATTI knew ozone lacked FDA approval. BHATTI explained to the employee that he nonetheless had found ozone therapy "effective" in his practice, and that this was why he continued to inject an unapproved drug.

34. Because ozone therapy and ozone injections are not approved by FDA, there is no established CPT code through which a provider could charge these unapproved therapies to insurance companies, to include government health care programs. BHATTI accordingly used a variety of false billing codes to bill ozone injections and mislead government health care programs about the true (and non-reimbursable) nature of the treatments he was administering to his patients. This conduct and its effects qualify as fraud in connection with the delivery of a health care item or offense pursuant to 42 U.S.C. § 1320a-7(a)(3).

35. BHATTI deliberately did not mention ozone in the medical records he created that documented his patients' office visits and the interventions they received. BHATTI's deceptive documentation practices reduced or eliminated the ability of government health care programs and the FDA to police and prevent BHATTI's unlawful use of unapproved and dangerous ozone therapies. BHATTI's failures to inform his patients about his use of ozone therapies, and to accurately describe his use of ozone in his medical records and billing data to Medicare, Medicaid, and FEHBP, constitute intent to mislead under 21 U.S.C. § 333(a)(2).

36. BHATTI stopped administering ozone injections to patients after law enforcement executed a search warrant at BHATTI's practice on or about October 8, 2020.

37. In total, from in or about August 2019, through on or about October 8, 2020, BHATTI submitted claims for and was paid $91,810 in billing relating to ozone injections to Medicare, Medicaid, and FEHBP which he was not legitimately entitled to receive.

38. The actions taken by the defendant, as described above, were taken willfully and knowingly, and with an intent to mislead. The defendant did not take those actions by accident, mistake, or with the belief that they did not violate the law.

39. The preceding includes only those facts necessary to establish the defendant's guilt as to the offense to which he is entering a guilty plea. It does not necessarily reference all information known to the government or to the defendant about the criminal conduct at issue.

Respectfully submitted,

Todd W. Blanche
Deputy Attorney General

Date: 2-3-26     By: _____
Shea M. Gibbons
Assistant United States Attorney

After consulting with my attorney, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Date: 2/3/26

Jawad Bhatti
Defendant

I am the defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, the defendant's decision to stipulate to these facts is an informed and voluntary one.

Date: Feb 3, 2026

Eric Atkinson
Attorney for Jawad Bhatti