**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 3:25-cr-99 |
| JAWAD BHATTI, | |
| *Defendant*. | |

**POSITION OF THE UNITED STATES**

The United States, through its undersigned attorneys, files this Position pursuant to the Court's oral Order of March 3, 2026 (*see* Dkt. No. 58, Minute Entry), which directed the parties to brief their respective positions regarding the Court's consideration of the proposed Plea Agreement (Dkt. No. 52) in this case—specifically, the parties' rationale and bases for the terms and scope of the Plea Agreement—in order to assist the Court in its assessment as to whether the Court should decline to accept the parties' jointly-submitted agreement as "lenient." Dkt. No. 58.

The United States carefully considered the factors enumerated at 18 U.S.C. § 3553(a), and weighed the punitive and deterrent value of defendant's felony conviction and the Plea Agreement's stipulated concessions against the United States' assessment of the litigation risk inherent in presenting this case before the petit jury.

The proposed Plea Agreement (and accompanying Statement of Facts, Dkt. No. 53) ensures that defendant—a pain management physician—will be stripped of his ability to ever again prescribe controlled substances, excluded from billing the United States Government's Medicaid and Medicare programs, and the now-interim suspension of his medical license will likely turn permanent. For all intents and purposes, his medical career is over. The Plea Agreement and defendant's sworn admissions in the Statement of Facts also effectively estop defendant from

1

advancing (in ongoing and anticipated civil actions) any defense, argument, or claim inconsistent with his sworn admissions that: defendant injected patients with a substance (ozone) that was not approved by the FDA; that such injections were thus unlawful; that defendant knew that these ozone injections were not approved by the FDA; that defendant's employment of this non-approved ozone therapy caused his patients to suffer side effects; that defendant often administered ozone injections without telling his patients what therapy he was administering; and that defendant used false billing codes to bill ozone injections and mislead government health care programs about the true (and non-reimbursable) nature of the treatments he was administering to his patients.

The United States entered into the terms of the Plea Agreement confident that this resolution is appropriate, fair, and just—that it holds defendant responsible for his misconduct, protects the public, and adequately deters like-minded offenders.

## I.      Legal Background

Rule 11(c)(3) of the Federal Rules of Criminal Procedure provides that a district court may accept or reject a proposed plea agreement, a decision that an appellate court reviews under the abuse of discretion standard. *See Santobello v. New York*, 404 U.S. 257, 262 (1971); *United States v. Midgett*, 488 F.3d 288, 297 (4th Cir. 2007). When reviewing a plea agreement of the type specified in Rule 11(c)(1)(B)—that is, a plea that includes an agreement by the United States to recommend (or not to oppose a defense request for) a specific sentence, sentencing range, or the applicability or lack of applicability a sentencing factor or Guidelines provision—the district court must advise the defendant that the Court is not bound by the parties' agreement, and that the defendant "has no right to withdraw the plea if the court does not follow the recommendation or request." Fed. R. Crim. Pro. 11.

## II.    The Sentencing Factors

In reaching the conclusion that the resolution reflected in the Plea Agreement is appropriate to the facts and circumstances here, the United States carefully considered the sentencing factors enumerated at 18 U.S.C. § 3553(a), and respectfully submits that the sentencing factors support the Plea Agreement.

### A.  Nature & Circumstances of the Offense

The nature and circumstances of defendant's misconduct, as is typically the case, is one of the most concerning sentencing factors. The crux of defendant's crime is that he injected his patients with a substance that he knew had not been approved by the FDA—ozone gas—despite knowing full well that it had not received regulatory approval, because he believed that the substance would nonetheless be an effective treatment for his patients' condition(s). Defendant did not obtain his patients' consent for administering the ozone gas injections, and defendant's patients suffered from these injections, both physically and from the abuse of the trust they placed in their pain management doctor. Defendant's offense conduct was fraudulent because he used false billing codes to bill these ozone injections to government health care programs, knowing that their ineligibility would render a truthful accounting of his treatment non-reimbursable. Defendant's fraud conviction (for Count Four) in connection with a health care offense qualifies him for mandatory exclusion from billing government healthcare programs. 42 U.S.C. § 1320a-7(a)(3). Defendant's misconduct, in short, was serious and deserving of the felony conviction and attendant consequences outlined in the Plea Agreement and conceded to by defendant.

While some aspects of defendant's case are consistent with many of the health care fraud cases that this Court confronts (fraudulent billings to government health care programs, e.g.), the United States is cognizant of an atypical factor: that is, defendant's apparently genuine belief that

ozone therapies were an effective but untested therapy for pain management. As indicated by the screenshots from defendant's website referenced in the Statement of Facts, he believed and advertised that ozone could treat all manner of disparate ailments. He even administered ozone therapies to friends and family members. While defendant's misinformed and mistaken belief does not excuse his actions—as evidenced by the reality of his felony conviction and the consequences outlined in the Plea Agreement—the nature of his reasoning for his actions differentiates his case from many of the other health care fraud defendants the United States Attorney's Office confronts.

## B. History and Characteristics of Defendant

Defendant's history and characteristics also support the Plea Agreement's agreed recommendation. Defendant, 54, has been a practicing physician for many years and has no criminal history. His law-abiding life until now is a significant point in his favor.

Defendant is also in poor physical and mental health. He suffers from Type II diabetes, has heart issues that required the placement of a stent, and is legally blind in one eye. He suffers from severe depression. Both the United States and district judges regularly consider physical and mental health in sentencing determinations, and significant health challenges can and often do result in significant downward variances, especially for defendants with no criminal history.[1] The United States considered defendant's history and characteristics in reaching the recommended resolution, and this factor both informs and supports the proposed Plea Agreement.

---

[1] For example, in *United States v. Mabel Jones*, 3:21-cr-30 (E.D. Va.), a nursing home administrator embezzled more than $800,000 in Medicaid and Social Security funds from her nursing home, and spent hundreds of thousands at casinos, luxury shops, travel, paying her mortgage, gifts to her child, etc. *Id.* at Dkt. No. 67. At the same time, her nursing home facility was in such disrepair that the buildings were deteriorating, food was moldy, and there was a severe bed bug infestation. Conditions were so terrible that indigent residents were sharing clothes and panhandling at the convenience store across the busy street, such that multiple residents were struck and killed by passing cars. At the same time, Ms. Jones suffered from numerous physical and mental health challenges, and these conditions combined with her age and lack of criminal history led to the imposition of a 24-month sentence, a significant downward variance. *Id.* at Dkt. No. 88.

C.  **Need to Afford Adequate Deterrence & Protect the Public**

The United States also considered the need to afford adequate deterrence and protect the public, and this factor also supports the parties' recommendation. A felony conviction for Dr. Bhatti provides significant deterrent value – both specific and general. Indeed, specific deterrence was one of the United States' highest priorities. To that end, the resolution here effectively ends defendant's medical career through a variety of means, and eliminates his access to the only atmosphere in which he has committed fraud and used non-approved therapies. The United States would not have accepted a resolution that did not effectively end Dr. Bhatti's career, and mandated during plea negotiations that any resolution include a felony conviction that would result in the loss of the ability to prescribe controlled substances and mandatory exclusion from the ability to bill government health care programs.

Defendant—understanding that he would be pleading guilty to a felony offense—agreed to surrender his license to prescribe controlled substances, a process that has already been completed. Dkt. No. 52 at 11 (portion of Plea Agreement specifying surrender of controlled substance registration within 15 days of the guilty plea). Defendant is not only prohibited from prescribing controlled substances, but his medical practice also cannot possess them in any manner. Defendant has also agreed never to re-apply for such a registration in the future. This concession in the Plea Agreement is significant; for all intents and purposes, a pain management doctor—whose practice revolves around managing pain, including through powerful opioids that are controlled substances—cannot maintain a pain management practice without controlled substances among his treatment options.

Further, once defendant's conviction is final, he is subject to mandatory exclusion from the ability to bill government health care programs. As part of his guilty plea, defendant agreed that

5

he committed fraud in connection with the delivery of health care pursuant to 42 U.S.C. § 1320a-7(a)(3). Subsection (a) of this statute is titled "Mandatory Exclusion," which means that after defendant's conviction is final, he will be unable to bill government health care programs in any capacity for a period of at least 5 years.[2] The Office of Inspector General for Health and Human Services administers this statutory program, and their website and accompanying Guide make clear that there is very little that defendant would be allowed to do in any kind of medical practice.[3] For example, defendant will be prohibited from performing any service that will eventually be bundled and billed to a government health care program. Guide at 7. In other words, defendant would even be prohibited from preparing surgical trays for a government-paid surgery, or driving an ambulance. *Id.* Given the ubiquity of government health care programs—about 36% of the country's population is covered by these programs[4]—there is very little defendant can do in the United States health care system.

These restrictions also essentially require the closure of defendant's practice, or his divorce from it. Defendant is no longer able to serve in any leadership or ownership role at an entity that bills government health care programs, and he also cannot provide administrative or management support, including basic functions like IT support, billing, or human resources functions. Simply put, defendant's lifelong vocation and medical career is—for all practical purposes—over. The United States stresses that the above-described consequences—while not enumerated or explained

---

[2]    Health    and    Human    Services,    Office    of    Inspector    General;    *Exclusion    Authorities*; oig.hhs.gov/exclusions/authorities.asp (last visited March 23, 2026) (indicating a minimum period of exclusion of five years for a violation of 42 U.S.C. § 1320a-7(a)(3), which is present here).

[3]    Health and Human Services, Office of Inspector General; *Exclusions, Background Information*; oig.hhs.gov/exclusions/background.asp (last visited March 20, 2026); Health and Human Services, Office of Inspector General, *Special Advisory Bulletin on the Effect of Exclusion from Participation in Federal Health Care Programs*, http://oig.hhs.gov/exclusions/files/sab-05092013.pdf (last visited March 20, 2026) ("Guide").

[4]    U.S. Census Bureau, *Health Insurance Coverage in the United States: 2023*; at 3, available at census.gov/library/publications/2024/demo/p60-284.pdf (last visited March 23, 2026).

in the Plea Agreement—are reliant on and a consequence of defendant's plea to Count Four of the Indictment. Defendant's guilty plea and his accompanying admissions in the Statement of Facts constitute the factual and legal bases for those administrative and regulatory actions—absent that plea, absent those admissions, defendant's position with those entities would be quite different.

Additionally, while the United States does not have any authority or jurisdiction over defendant's medical license, the Virginia Board of Medicine has summarily suspended defendant's license to practice medicine—a suspension that had to be an obvious result to defendant when he entered a guilty plea before this Court that would require his admissions to precisely the type of conduct giving rise to the Board of Medicine's decision to suspend his license. That interim suspension—assuming the Court's acceptance of defendant's proposed guilty plea—will almost certainly become permanent. Administering FDA-unapproved treatments and failing to obtain informed consent for medical treatments, as defendant has admitted to doing in the Statement of Facts, are breaches of the medical standards of care and accordingly, grounds for the Board's decision to terminate defendant's medical license.

The United States also believes the Plea Agreement serves the purposes of general deterrence. The question here is whether the consequences defendant will suffer because of his plea to the conduct alleged in Count Four are sufficiently severe to deter other pain management physicians from administering treatments to their patients that have not been approved by the FDA (and to submit billing designed to conceal that practice). The answer to that question is yes. This is so because there are few—if any—sanctions more alarming and devastating for a medical professional than the prospect of losing the ability to practice in their field. Not only would they lose their well-paying livelihood, they would also forfeit the psychological and practical value of what has typically been a lifetime of training and education specific to that profession. The

7

government is emphatically not conceding that a custodial sentence is never appropriate for a medical professional because professional sanctions are sufficient punishment. The point is merely that general deterrence can often still be accomplished for medical professionals even without a custodial sentence.

Indeed, there are a plethora of cases involving medical professionals that involve little to no actual custodial incarceration. In the case discussed extensively in the motion to dismiss briefing, the case against the doctor accused of injecting adulterated liquid silicone into his patients was resolved via a deferred prosecution agreement. *United States v. Barnett*, 1:99-cr-124, 2000 Dist. LEXIS 9677 (S.D.N.Y. July 12, 2000); *id.* at Dkt. Nos. 29-31; *see also United States v. Petrie*, 1:25-cr-172 (E.D. Va.) (president and chief operating officer of a medical provider caused $1.9 million in actual loss to a private health insurance company; resulting sentence was one year and one day, *see* Dkt. No. 33); *United States v. Schasse*, 3:25-cr-92 (E.D. Va.) (nurse who diverted opioids more than two dozen times and caused ineffective pain medications to be delivered to patients sentenced to probation despite a guidelines range of 41-51 months, *see* Dkt. No. 33); *United States v. Mabel Jones*, 3:21-cr-30 (E.D. Va.) (nursing home administrator referenced above who embezzled more than $800,000 sentenced to 24 months despite a guidelines range of 70-87 months, *see* Dkt. No. 88). By contrast, defendant's fraud loss amount is $91,810. Dkt. No. 53 at 9.

While health care fraud offenses are serious crimes, the actual sentences imposed reflect that other interests, such as the efficacy of specific and general deterrence, warrant the imposition of downward variances such that the proposed Plea Agreement is both reasonable and consistent with the resolutions reached in other similar cases.

8

### III.    Collateral Consequences

Defendant also faces particularly high collateral consequences stemming from his plea of guilty, and the reality of those impending and concomitant consequences informed the United States' decision to enter into this Plea Agreement. Most importantly, defendant is collaterally estopped from advancing any claim or defense in later civil litigation that is inconsistent with the Plea Agreement and Statement of Facts for the criminal conviction. *United States v. Wight*, 839 F.2d 193, 196 (4th Cir. 1987); *United States ex rel. Schnupp v. Blair Pharmacy*, No. CV ELH-17-2335, 2025 WL 375927, at *28 (D. Md. Jan. 28, 2025) (applying *Wight* in the context of a criminal conviction and a follow-on False Claims Act civil action) ("For purposes of collateral estoppel, a defendant is bound by the statement of facts included in his plea agreement.").

This is significant because the Criminal Section of the U.S. Attorney's Office is aware that the Civil Division of the same office has a pending False Claims Act investigation against defendant, an investigation that is more extensive in its scope than that reflected in the criminal Indictment. The potential financial consequences stemming from this type of civil litigation are extensive: three times the damage the Government sustained, plus civil penalties for each false claim that range from $14,308 to $28,619. 31 U.S.C. § 3729(a); 28 C.F.R. § 85.5, Table 1, *available at* ecfr.gov/current/title-28/chapter-I/part-85/section-85.5.

The United States—as a bargained-for concession in the Plea Agreement—required defendant to concede in the accompanying Statement of Facts the accuracy and relevance of numerous admissions regarding the nature and scope of his misconduct—chiefly, that his use of ozone therapies was knowingly unlawful, and that he likewise knowingly submitted fraudulent documentation to government health care programs—that will be of obvious and critical importance in that civil action.

Further, individual patients also have the option of pursuing civil malpractice claims against defendant. For the same reasons that defendant is likely to lose his medical license—administering FDA-unapproved therapies without his patients' informed consent, as explicitly admitted and enumerated in the Plea Agreement and the Statement of Facts—such malpractice claims will have some of their elements covered by defendant's conceded admissions in the Statement of Facts.

The civil consequences that flow from defendant's conviction go well beyond those directly related to his felony conviction. The United States considered these second-order effects in fashioning the Plea Agreement, and these effects support the reasonableness of the Plea Agreement's recommendations—because those forthcoming consequences are dependent on and a consequence of the fact of defendant's plea of guilty to Count Four, and the fact of defendant's admissions in the accompanying Statement of Facts.

## IV.    Assessment of Litigation Risk

Litigation risk is always an important factor the United States considers in resolving cases, and this case is no exception. Put simply, the United States has carefully and comprehensively reviewed and considered the evidence that the United States possesses to prove its case-in-chief; weighed the persuasive value of that evidence as regards both the circumstances of this case, and the nature and scope of the defense's case; and assessed the risk-benefit calculus of entering into the proposed plea agreement versus proceeding to a jury trial.

The United States respectfully but forcefully submits to this Court that the proposed Plea Agreement—ensuring defendant is convicted of a felony, and thereby obviating any possibility that he is ever again afforded access to patients or the federal health care system—is the product of that clear-eyed and pragmatic calculus. The United States—given that assessment—believes

10

that the Plea Agreement is a better, wiser, and more effective resolution to this case than proceeding to trial, and concomitantly serves the interests of the United States and the public.

While the United States believes in the strength of its allegations, it is also aware that the anticipated two-week trial was likely to revolve in significant part around dueling expert testimony, with all the attendant challenges and risks. The United States' experts opined that the ozone machines and any product thereof were misbranded and/or adulterated, ozone therapy was *per se* prohibited, that defendant did not properly bill for nerve blocks, and it was wrong to bill for radiological guidance to insert a needle when either no radiological guidance was used or the guidance was used post-injection. Defendant's expert disagreed, and claimed that ozone therapies were outside FDA's regulatory authority and could be appropriately used within the context of a doctor-patient relationship, defendant appropriately billed nerve blocks, and that post-injection radiological imaging was medically appropriate.

The United States' assessment of the litigation risk present in this case is not limited, of course, to an evaluation of defendant's proffered expert testimony, but also necessarily encompasses a review of the entirety of the United States' evidence—a universe that includes documentary evidence, witness testimony from former employees and patients of defendant, presentation and analysis of billing records and associated paperwork, etc.

The United States will not delve deeply into its internal, clear-eyed assessment of the relative strengths and weaknesses of each of those various categories of evidence,[5] other than to note broadly that many of the surrounding circumstances of this case—to include the passage of time; the understandable difficulty inherent in witnesses' ability to recall with precision the

---

[5] The United States appreciates the Court's acknowledgment of the propriety of (and necessity for) the United States' circumspection regarding the details and nature of the United States Attorney's Office's internal prosecutorial discussions, analyses, and decisions.

11

particulars of long-ago visits to defendant's practice; and certain witnesses' physical and psychological conditions and limitations—present not-insignificant challenges.

As one specific example (which the United States references only because defendant has candidly signaled his intent to highlight this factor during the course of the jury trial), defendant's patients visited his practice for the purpose of obtaining pain management treatment, and the prescription of opioids is typically a significant aspect of pain management. These witnesses could be—and the defense has not surprisingly signaled, will be—impeached on the basis that they were taking prescription pain medication before, during, and after their interactions with defendant. On the other side of these interactions was a licensed medical doctor, a position that remains highly respected in society. Thus, even with numerous patients as witnesses, the United States notes that the adage that "there are two sides to every story" will be of obvious importance and consequence in this case, highlighting the potential impact of the still-significant factual disputes sure to arise about the specific details of what occurred during visits to defendant's practice.

The United States' assessment of the litigation risk present in this case, combined with all the other factors addressed above, informed the United States' considered conclusion to enter into the Plea Agreement, confident that the proposed Agreement is a satisfactory and appropriate resolution to this case.

## Conclusion

For the reasons outlined above, the United States respectfully submits that the Court should accept that the proposed plea agreement advanced by the parties is an appropriate, fair, and just resolution to this matter, and approve the agreement and accept defendant's plea.

Respectfully submitted,

Todd W. Blanche
Deputy Attorney General

By:  _____/s/_____

Shea Matthew Gibbons
Virginia Bar No. 83916
Assistant United States Attorney
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23229
Telephone:    (804) 819-5400
Facsimile:    (804) 771-2316
Email:  Shea.Gibbons@usdoj.gov