**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division**

UNITED STATES OF AMERICA,       )
*Plaintiff*,       )
      )
v.       )    Criminal No.: 3:25-cr-099-REP
      )
JAWAD BHATTI,       )
*Defendant*.       )

**RESPONSE TO POSITION OF THE UNITED STATES**

COMES NOW Defendant, Dr. Jawad Bhatti, by counsel, and for his Response to the Position of the United States concerning the proposed plea agreement ("**Plea Agreement**") in this matter (ECF No. 52.) states as follows:

**INTRODUCTION**

At the hearing on March 3, 2026 ("**Hearing**"), this Court ordered the parties to submit position papers addressing whether the Plea Agreement serves the 18 U.S.C. § 3553(a) factors. (ECF No. 59). Specifically, the Court directed the parties to "file briefs on whether or not the Court ought to reduce or can properly reject [the Plea Agreement] as being 'lenient' and 'not serving the objectives of 3553(a)" given the Court's opinion that the "idea of a noncustodial sentence is startling." Tr. at 6:4. On March 25, 2026, the Government filed its position paper ("**Government's Position**") (ECF No. 60), which not only reiterated the Government's position as expressed at the Hearing, but also specifically addressed the Court's various concerns raised at the Hearing. Dr. Bhatti agrees with the Government's Position and submits this response to provide the Court with additional information to demonstrate that the Plea Agreement, and the non-custodial sentence recommended therein, is not only reasonable but is fully consistent with the 18 U.S.C. § 3553(a) factors and with the sentences imposed in comparable—and far more serious—federal cases.

## LEGAL STANDARD

Pursuant to Federal Rule of Criminal Procedure 11(c)(3) the Court may accept or reject the Plea Agreement or defer its decision "until the Court has reviewed the presentencing report." As the Court correctly noted at the Hearing, "[A] court is well-advised to reject a plea agreement that dismisses a charge if it finds that the remaining charges do not adequately reflect the seriousness of a defendant's actual offense behavior." *United States v. Smith*, 417 F.3d 483, 487 (5th Cir. 2005). Critically, when determining what constitutes the "defendant's actual offense behavior" various district courts have found that "when U.S.S.G. § 6B1.2(a) speaks of 'actual offense conduct', ***it must refer to actual offense conduct that the government believes can be proven beyond a reasonable doubt***." *United States v. Enquist*, 745 F. Supp. 541, 543 (N.D. Ind. 1990) (citing *United States v. Adonis*, 891 F.2d 300, 303–304 & n. 5 (D.C.Cir.1989); *United States v. Restrepo*, 698 F.Supp. 563, 565 (E.D.Pa.1988)) (emphasis added). This standard is central to this matter: the Government's own assessment of what it could prove beyond a reasonable doubt drove the terms of the Plea Agreement.

## DISCUSSION

Dr. Bhatti was originally charged in a 26-count indictment ("**Indictment**") (ECF No. 3). After reviewing Dr. Bhatti's expert reports, considering its own litigation risk, and discussing the case extensively with Dr. Bhatti's counsel, the Government agreed to permit Dr. Bhatti to plead guilty to a single count of misbranding in violation of 21 U.S.C. § 331(k), 333(a)(2) for which it would recommend a non-custodial sentence. (ECF No. 52).

### I.    *The Government Will Not Be Able to Prove Its Case on Counts 5–26 Therefore Dr. Bhatti's Plea to Count 4 Alone Is Appropriate.*

This Court has indicated that it may reject the Plea Agreement as "lenient" given "all of the charged offenses." *See* Tr. at 21:10–11. But Dr. Bhatti only pled guilty to Count 4—a single count that is limited in time and scope to capture provable conduct in violation of the law. The

remaining 22 counts are not part of this plea for a reason: the Government will not be able to prove them beyond a reasonable doubt.

The Court itself appeared to recognize that the Government may have overcharged Dr. Bhatti in this matter and would have struggled to prove its case as to Counts 5–26. *See e.g.*, Tr. at 38:25–39:4 ("Now, if you're telling me you have a weak case and you don't think you can win and this is the best you can do, then that's an appropriate consideration in determining the reasonableness of the plea as against the nature of the charges"), Tr. at 45:24–46:1 ("The more I hear you talking, the more I'm concerned about the extent to which proving the case is a factor in the decision you made."), Tr. at 61:10–11 ("If the case was ill brough to begin with, then say that."). Even the Government admitted at the Hearing that it is "hotly disputed" whether "[Dr. Bhatti] can be proven guilty of the other offenses" in the Indictment. Tr. at 24:2–4.   That concession was likely driven by the strength of the testimony that Dr. Bhatti was prepared to present at trial, including through expert testimony.

Specifically, Defendant's expert, Dr. Shaheen Lakhan, MD, PhD, FAAN, was prepared to testify that:

> While the ozone generators identified in the indictment were not FDA-cleared for marketing in the United States, their in-office use by a licensed physician falls within the practice of medicine and outside the FDA's enforcement scope. Under 21 U.S.C. § 396, the FDA regulates manufacturers and distributors, not physicians' therapeutic choices. These systems were used as physiologic support tools that deliver controlled ozone-oxygen mixtures aiming to enhance circulation, tissue oxygenation, and recovery, functions analogous to other low-risk adjunctive modalities such as hyperbaric oxygen, infrared therapy, or radio-frequency ablation. Dr. Bhatti's employment of these systems therefore represented a good-faith exercise of medical discretion rather than the commercial distribution or misbranding of medical devices.

Def's Expert Disclosure at 1–2. Dr. Lakhan would have also explained that:

> [T]he government's own materials reference and reproduce written descriptions for the ozone-lidocaine injections, primarily through Dr. Bhatti's website. The presence of these written materials, which set out what the therapy purported to do, shows that descriptive

information existing in writing and was publicly available, undermining the allegation that Dr. Bhatti intended to conceal the nature of the treatment from patients. Dr. Lakhan will further testify that, to the extent any additional disclosure was provided verbally during clinical and supported by office materials, the totality of the circumstances reflects transparency rather than concealment and intent to mislead.

Def's Expert Disclosure at 2. Dr. Lakhan was also prepared to testify that:

[C]ombining ozone with lidocaine constitutes a form of medical compounding for immediate use, which is governed by state professional regulation, not FDA premarket approval . . . [and] that published medical literature supports ozone's analgesic and anti-inflammatory properties and that its use in pain medicine is internationally recognized.

Def's Expert Disclosure at 2. Dr. Lakhan would have further explained that:

[N]erve-block procedures may properly involve local anaesthetic alone and do not universally require a steroid such as Kenalog to be medically necessary or reimbursable. . . . [A]ny apparent discrepancies between medication inventory and procedural notes do not, by themselves, demonstrate falsification or intent to deceive. . . . [L]isting "Kenalog" in procedural documentation could have reflected a clerical or billing convention rather than a deliberate misrepresentation, particularly if the CPT code corresponded to a nerve-block service that does not require a steroid component.

[Additionally,] ultrasound guidance, billed under CPT 76942, may reasonably include imaging performed immediately before, during, or after an injection as part of a continuous protocol ensuring safe needle placement and verifying results.

Def's Expert Disclosure at 3–4. Perhaps most importantly, Dr. Lakhan would have testified that "imprecise documentation or high-volume billing is not, in itself, evidence of fraud" and is instead a common issue confronted by providers and regulated in administrative Medicare payment appeals, as Dr. Bhatti's counsel referenced at the Hearing. Def's Expert Disclosure at 4; *see also* Tr. at 50:11–20 (discussing Medicare administrative appeals). While the Government's experts would have contested Dr. Lakhan's testimony, the Government appreciated that his testimony was compelling and could have swayed the jury in Dr. Bhatti's favor.

In addition, to prove Counts 5–26, the Government would also have to rely heavily on lay witness testimony. The Government likely appreciated that the memories of the witnesses may have faded over time, given that some of the conduct is over six years old. Even so, there are

likely only a limited number of people with actual knowledge of the conduct alleged in Counts 5–26, making the Government's proof of the same far more challenging, especially in light of the expert testimony highlighted above.

**II.      *The Plea Agreement Provides Both Specific and General Deterrence as Required by 18 U.S.C. § 3553(a).***

At the Hearing, the Court was also focused on whether the Plea Agreement met the 18 U.S.C. § 3553(a) sentencing factors, particularly those of specific and general deterrence. As the Government correctly stated at the Hearing and in the Government's Position (ECF No. 60), the Plea Agreement provides significant specific and general deterrence for the conduct shown in Count 4. Indeed, the consequences of Dr. Bhatti's guilty plea are severe, far-reaching, and career-ending.

Specifically, Dr. Bhatti's guilty plea has ended his medical career, as it required him to permanently surrender his Drug Enforcement Administration controlled substance registration and agree never to re-apply for the same. (ECF No. 52) (Plea Agreement ¶ 15). For a pain management physician whose practice revolves around managing pain—including through the use of controlled substances—the inability to prescribe controlled substances renders the continuation of such a practice impossible.

Further, upon finalization of his conviction, Dr. Bhatti is subject to statutory exclusion from billing government health care programs, including Medicare and Medicaid, potentially for a minimum of five years pursuant to 42 U.S.C. § 1320a-7(a)(3). Given that Medicare beneficiaries comprise a large portion of the pain management patient population in this country, Dr. Bhatti's exclusion from the same forecloses his ability to function in the United States health care system in any meaningful capacity. In addition, the Virginia Board of Medicine will soon take adverse action against Dr. Bhatti's license to practice medicine which, given his guilty plea and admissions

in the Statement of Facts, may be permanent. As the Government correctly stated at the Hearing, there are few sanctions more devastating for a medical professional than the prospect of losing the ability to practice in their field. Dr. Bhatti will lose not only his livelihood, but also the psychological and practical value of a lifetime of training and education specific to his profession. These consequences provide overwhelming specific deterrence against any future misconduct and serve as a powerful general deterrent to other physicians who might consider administering treatments that have not been approved by the FDA.

Beyond these professional consequences, Dr. Bhatti faces substantial additional collateral consequences that compound the deterrent effect of the Plea Agreement. The Civil Division of the United States Attorney's Office has a pending False Claims Act investigation ▮▮▮▮▮▮ ▮▮▮▮▮▮ against Dr. Bhatti, the potential financial consequences of which include treble damages and civil penalties. As a result of the Plea Agreement, he may be collaterally estopped from advancing any claim or defense in that matter, or any future civil litigation, that is inconsistent with his admissions in the Plea Agreement and Statement of Facts. (ECF Nos. 52, 53). Individual patients are also pursuing civil claims against Dr. Bhatti. These cascading civil consequences, flowing directly from the Plea Agreement, further demonstrate that the Plea Agreement carries deterrent value well beyond the sentence itself.

As will be set forth in more detail in Dr. Bhatti's Sentencing Memorandum at an appropriate time, the conduct set forth in the Plea Agreement is limited in time and scope. For those reasons the loss amount is also limited.

### III. A Non-Custodial Sentence Is Not Too Lenient for the Conduct in Count 4 and Is Consistent with Other Sentences Involving Similar Conduct.

At the Hearing, the Court expressed concern about the "epidemic of Medicare fraud and Medicaid fraud in this country" (Tr. at 23:14) and stated that "Medicare and Medicaid fraud [are]

rampant in this country" (Tr. at 62:12–13). But this case is not about Medicare or Medicaid fraud. Dr. Bhatti pled guilty to use of misbranded or adulterated devices, namely ozone machines he purchased for pain management purposes.  The only reference to fraud in the Plea Agreement is as it relates to 42 U.S.C. 1320a-7(a)(3), which is a violation of the Social Security Act that triggers payment suspension from Medicare and Medicaid. It is not a standalone charge of health care fraud. Still, at the Heairng the Court indicated that it could not "recall a sentence lacking in confinement of some sort" for "charges involving Medicare and Medicaid," leading the Court to doubt that the recommended non-custodial sentence was "consistent with other sentences involving similar allegations." *See* Tr. at 62:18–20, 23–24.

However, a non-custodial sentence for Dr. Bhatti's conduct—pleading guilty to a single count of misbranding in violation of 21 U.S.C. § 331(k), 333(a)(2)—is well within the range of sentences imposed in comparable cases, including cases involving far more egregious conduct and far greater losses. The Court need look no further than the seminal misbranding prosecution under the same statutory framework: *United States v. The Purdue Frederick Company, Inc.*, 495 F.Supp. 2d 569 (W.D. Va. 2007).

In *Purdue*, the company pleaded guilty to felony misbranding of OxyContin—the same category of offense under the Federal Food, Drug, and Cosmetic Act—"with the intent to defraud or mislead." 21 U.S.C. §§ 331(a), 333(a)(2). The individual defendants, including the former president and CEO, the executive vice president and chief legal officer, and the former chief scientific officer of Purdue, pleaded guilty to misdemeanor misbranding as responsible corporate officers. The court accepted plea agreements that provided for no incarceration for the individual defendants. *Purdue*, 495 F.Supp. 2d at 576.

The contrast between the *Purdue* case and the instant matter is stark. Purdue's misbranding of OxyContin contributed to a nationwide opioid epidemic that caused untold misery, addiction, and death. The monetary sanctions in *Purdue* totaled approximately $600 million. *Id*. at 572. By comparison, Dr. Bhatti's total fraud loss amount is $91,810. (ECF. No. 53 at 9). If non-custodial sentences were appropriate for the senior executives of a pharmaceutical company whose misbranding fueled a public health crisis of historic proportions, a non-custodial sentence is plainly appropriate for a solo pain management physician whose misbranding involved unapproved ozone treatments that he genuinely believed were helping people.

Similarly, Martin Elling, a former senior partner at McKinsey & Company, who advised Purdue Pharma on approximately 30 engagements—the very engagements designed to "turbocharge" OxyContin sales by intensifying marketing to high-volume prescribers—was sentenced to just 6 months in federal prison for obstructing justice related to his work on Purdue Pharma matters. Press Release, Former Senior Partner at McKinsey & Company Sentenced, DOJ (May 23, 2025). When state attorneys general began suing Purdue board members in 2018, Elling emailed a colleague suggesting they should be "eliminating all our documents and emails." *Id.* He then systematically deleted more than 100 Purdue-related files from his McKinsey-issued laptop, including a folder titled "Purdue" containing a subfolder entitled "Strategy," and purged a Purdue-related folder from his Outlook email account—all with the express purpose of obstructing a Department of Justice investigation into the opioid crisis. Elling pleaded guilty to one count "charging him with knowingly destroying records with the intent to impede, obstruct, and influence the investigation." *Id.*

Despite the gravity of this conduct, Elling received a sentence of only six months of incarceration, two years of supervised release, 1,000 hours of community service, and a $40,000

fine. *Id.* If six months was deemed sufficient for an individual who actively obstructed a federal investigation into the opioid crisis that has devastated communities across this country, a non-custodial sentence is more than reasonable for Dr. Bhatti, who cooperated with the Government, accepted responsibility, and whose conduct—while misguided—was motivated not by greed or self-interest, but by a genuine belief that ozone therapy could help his patients manage their pain.

As acknowledged in the Government's Position (ECF No. 60 at 8), other federal cases confirm that non-custodial or minimal custodial sentences are regularly imposed in healthcare-related offenses. *See e.g.*, *United States v. Barnett*, 1:99-cr-124, 2000 Dist. LEXIS 9677 (S.D.N.Y. July 12, 2000), *United States v. Schasse*, 3:25-cr-92 (E.D. Va.), *United States v. Mabel Jones*, 3:21-cr-30 (E.D. Va.), *United States v. Petrie*, 1:25-cr-172 (E.D. Va.).

Dr. Bhatti's case is distinguishable from each of these cases in ways that favor a more lenient result. Unlike the defendant in *Schasse*, Dr. Bhatti did not divert controlled substances. Unlike the defendant in *Mabel Jones*, Dr. Bhatti did not embezzle hundreds of thousands of dollars for personal enrichment while vulnerable patients suffered in squalor. And unlike the defendant in *Petrie*, Dr. Bhatti's actual loss amount was a fraction of $1.9 million. The proposed non-custodial sentence is therefore not only consistent with the sentences imposed in comparable cases, but is also supported by the mitigating factors unique to Dr. Bhatti's situation, including his lack of criminal history, his significant health challenges, and the nature of his genuine—if misguided—belief in the therapeutic value of the treatments he administered.

## CONCLUSION

For the reasons stated above, Defendant Dr. Bhatti respectfully requests that the Court approve and accept the Plea Agreement.

DATED: April 3, 2026                          Respectfully submitted,

                                              By:   */s/ Joseph E. H. Atkinson*
                                              Joseph E.H. "Eric" Atkinson (VSB No. 70016)
                                              jeatkinson@whitefordlaw.com
                                              Whiteford, Taylor & Preston L.L.P.
                                              1021 E. Cary Street, Suite 2001
                                              Richmond, Virginia 23219
                                              *Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2026, I caused a true and correct copy of the foregoing to be electronically filed using the Court's CM/ECF system, which thereby caused the above to be served electronically on all registered users of the Court's CM/ECF system who have filed notices of appearance in this matter.

*/s/Joseph E. H. Atkinson*
Counsel