

FILED

May 19, 2026

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

UNITED STATES OF AMERICA

v.                                          Criminal No. 3:25cr99

JAWAD BHATTI


**MEMORANDUM OPINION**

This matter is before the Court on the REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE (ECF No. 55); the INDICTMENT (ECF No. 3); the PLEA AGREEMENT (ECF No. 52) and its accompanying STATEMENT OF FACTS (ECF No. 53), and the PRESENTENCE INVESTIGATION REPORT (ECF No. 81). After consideration of those papers, the Court, on March 3, 2026, advised the parties that it was disinclined to accept the PLEA AGREEMENT and orally ordered the parties to file STATEMENTS OF POSITION explaining how and why the PLEA AGREEMENT serves the factors of 18 U.S.C. § 3553(a). (ECF No. 59). Having considered the POSITION OF THE UNITED STATES (ECF No. 60), the RESPONSE TO POSITION OF THE UNITED STATES (ECF No. 62), and the REPLY OF THE UNITED STATES (ECF No. 64), and the previously enumerated documents, as well as the CONSENT ORDER OF FORFEITURE (ECF No. 56), the Court declines to approve the PLEA AGREEMENT (ECF No. 52) or to accept the REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE (ECF No. 55).

**BACKGROUND FACTS**

**1. THE CHARGES AGAINST BHATTI**

Jawad Bhatti was indicted on twenty-six counts, Counts 1 through 3 of which have been dismissed.  He thus faces twenty-three counts all of which arise out of the acquisition and receipt of ozone devices which were used to create ozone which was combined with lidocaine which combination was then injected into various patients.  After those injections, Bhatti submitted to federal health care agencies (Medicare and Medicaid) falsified and misleading bills for payment of services, substantial parts of which were paid to Bhatti.

Count 4 charges Bhatti with causing acts respecting a drug (the making of ozone and then combining it with lidocaine) that resulted in the drug being misbranded, in violation of 21 U.S.C. §§ 331(k) and 333(a)(2).  That conduct is alleged to have transcended a period beginning in July 2019 and continuing to an unspecified date in 2023.[1]

Counts 5 through 10 involve misconduct that also took place from July 2019 to 2023.  Those counts charge Bhatti with executing a scheme and artifice to commit health care fraud by using false and fraudulent pretenses, representations, and promises, the purpose of which was to obtain health care benefit payments from Medicaid and Medicare to which Bhatti was not entitled by

---

[1] ECF No. 3, p. 20, ¶¶ 61 and 62.

2

submitting false and fraudulent billing claims to Medicaid and Medicare related to the injections of the ozone/lidocaine and the fraudulent billing of non-FDA approved treatments (the ozone/lidocaine combination) as an FDA-approved nerve block treatment instead.  Those counts involve two different patients (Patients 2 and 3).

Counts 11 through 14 involve misconduct occurring in 2020. Those counts charge that, in billing for the ozone/lidocaine injections, Bhatti made materially false, fictitious, and fraudulent statements in connection with the delivery of, and payment for, health care benefits, items and services involving Medicaid and Medicare, in violation of 18 U.S.C. § 1035(a)(2). Those counts involve four different patients (Patients 1, 2, 3, and 4).

Counts 15 through 20 charge Bhatti with executing a scheme to commit health care fraud by using false pretenses and representations and promises in connection with the delivery of, and payment for, health care benefits, items and services, the purpose of which to obtain health care benefit payments from Medicaid and Medicare to which Bhatti was not entitled by submitting false and fraudulent billing claims to Medicaid and Medicare related to the radiological insertion of needles.

An examination of the INDICTMENT shows linkage between the health care fraud charges in Counts 5 through 10, the false

3

statements related to health care matters alleged in Counts 11 through 14, and the health care fraud alleged in Counts 15 through 20. In particular, it appears that Counts 5, 7, 9, and 10 pertain to the same conduct which is the subject of Counts 11, 12, 13, and 14, respectively. And the radiological guidance charges in Counts 15 through 20 also bear the same linkage. Thus, it appears that: (1) the conduct charged in Counts 5 and 11 is also the subject of Count 15; (2) the conduct charged in Count 6 is also the subject of the conduct in Count 16; (3) the conduct charged in Count 12 is also the subject of Count 17; (4) Count 8 involves the same conduct involved in Count 18; (5) Counts 9 and 13 involve the same conduct as alleged in Count 19; and (6) Counts 10 and 14 involve the same conduct alleged in Count 20.

Counts 21 through 26 allege that Bhatti made false statements related to health care matters in violation of 18 U.S.C. § 1035(a)(2). Each of those charges has to do with the billing for radiological guidance when inserting needles into patients when, in fact, no such guidance was used. Again, there is linkage between the events recited in previous counts and the conduct recited in Counts 21 through 26. For example, Count 21 appears to involve the same conduct asserted in Counts 5 and 11; the conduct alleged in Count 22 involves the same conduct alleged in Count 6; the conduct alleged in Count 23 involves the same conduct alleged in Count 7; the conduct alleged in Count 25 involves the

4

same conduct alleged in Counts 9 and 13; and the conduct alleged in Count 26 involves the same conduct alleged in Counts 10 and 14.

The INDICTMENT also alleges a forfeiture claim. In particular, it is charged that, "at least $1,206,690.92," represents the gross proceeds of the offenses charged in Counts 1 through 26.

In sum, Counts 5 through 26 allege generally that, in respect of individuals named as Patients 1, 2, or 3, respectively, Bhatti unlawfully gave an injection (consisting of ozone and lidocaine) to the patient and billed Medicare by falsely calling the injection either a nerve block or steroid when, in fact, it was not a nerve block or steroid, and he falsely represented that he was using radiological guidance to make the insertions when he was not.

The INDICTMENT charges, in paragraph 72, that, as respects the offenses in Counts 5 through 10, Bhatti fraudulently billed Medicare and Medicaid a total of $1,941,204.32 of which he was paid $465,352.54. In paragraph 92, it is alleged that, in respect of Counts 15 through 20, Bhatti fraudulently billed Medicare and Medicaid $3,261,170.64 of which he was paid $741,338.38. Together those payments total $1,206,690.90.

## 2.   THE PLEA AGREEMENT

On February 3, 2026, the United States and Bhatti entered into a PLEA AGREEMENT, pursuant to Fed. R. Crim. P. 11(c)(1)(B), by which Bhatti agreed to plead guilty only to Count 4 (the use of

a misbranded drug—the combination of ozone and lidocaine).  The maximum penalties for Count 4 are three years imprisonment, a fine of $10,000, full restitution, forfeiture of assets, a special assessment, and a maximum supervised release term of one year. (ECF No. 52, ¶ 1).  A STATEMENT OF FACTS accompanied, and was incorporated in, the PLEA AGREEMENT.

In paragraph 4 of the PLEA AGREEMENT, Bhatti and the United States agreed to recommend "a noncustodial sentence at the defendant's sentencing."  (ECF No. 52, p. 3).  In paragraph 10, Bhatti agreed to entry of a Restitution Order "for the full amount of the victims' losses as determined by the Court."  That paragraph identified the victims and provided the Restitution Amount for those victims, which totaled $91,810.00,[2] notwithstanding the losses of $1,206,690.90 alleged in the INDICTMENT (ECF No. 3, p. 32).

In paragraph 11 of the PLEA AGREEMENT, Bhatti agreed to forfeit:

> all interests in any fraud-related asset that the defendant owns or over which the defendant exercises control, directly or indirectly. This includes any property that is traceable to, derived from, fungible with, or a substitute for the following: property that constitutes the proceeds of the offense.

_____

2 It also says that the specified sum does not limit "the amount of restitution that the Court must impose."

(ECF No. 52, p. 6).   A CONSENT ORDER OF FORFEITURE (ECF No. 56) entered on February 19, 2026 directed a forfeiture of $91,810.00

## 3. THE STATEMENT OF FACTS

The STATEMENT OF FACTS (ECF No. 53) describes Bhatti's conduct in paragraphs 12 through 38.   Therein, Bhatti acknowledged that the offense conduct occurred between July 2019 through on or about October 8, 2020.   Bhatti admitted that he acquired ozone-making machines which he first used to manufacture ozone, then inject a drug that contained a combination of ozone and lidocaine that was not approved by the FDA (i.e., making the injected combination a misbranded drug), knowing that "it is illegal to use ozone in medical applications."   He then acknowledged that he had injected that illegal drug into many patients.

After reciting a number of provision involving the regulation of drugs and the administration thereof, the STATEMENT OF FACTS recites that, in July and August 2019, Bhatti bought and received in interstate commerce two machines that made ozone, a HYPER MEDOZON and a OZON 2000, both manufactured in, and shipped from, Germany, and that, from August 2019 to October 8, 2020, Bhatti used the OZON 2000 and the HYPER MEDOZON machines at his medical practice "to create ozone gas from medical grade oxygen and administered that ozone to patients and employees."   (ECF No. 53, ¶ 25)   The STATEMENT OF FACTS also recites that the injections he gave often caused physical side effects in his patients and that

7

often he administered the ozone compound without securing the patient's informed knowledge and consent. (ECF No. 53, ¶¶ 31 and 32) And, Bhatti admits that he "was aware that the use of ozone for medical purposes was not approved by FDA." (ECF No. 53, ¶ 33)

The STATEMENT OF FACTS then recites additional criminal conduct. In particular, Bhatti acknowledged that: (1) he used a variety of false billing codes to bill the ozone injections and to mislead the health care programs (Medicare and Medicaid) about the true and non-reimbursable nature of the treatments for which he was billing the programs; and (2) the admitted conduct and its effect "qualifies as fraud in connection with the delivery of a health care item or offense pursuant to 42 U.S.C. § 1320a-7(a)(3)." (ECF No. 53, ¶ 34). Read as a whole, the STATEMENT OF FACTS thus contains factual allegations sufficient to support convictions of Counts 4 through 26.

Additionally, notwithstanding that the INDICTMENT sought a forfeiture of over $1.2 million, the STATEMENT OF FACTS and PLEA AGREEMENT contained forfeiture and restitution provisions amounting to $91,810.00. How that sum is related to the charge in Count 4 or why it is less than the $1.2 million alleged in the INDICTMENT, are not clear in either the PLEA AGREEMENT or in the STATEMENT OF FACTS. The Presentence Report in this case reflects that Bhatti has a total net worth of $3.7 million.[3] Nothing in

---

[3] It appears from the Presentence Report, ¶ 69 that approximately

the papers explain why the objectives of 18 U.S.C. § 3553(a) are served by allowing Bhatti to plead to a count with a maximum fine of $10,000.00 or why a forfeiture or restitution amount should be $91,180.00.

In sum, the offense conduct described in the STATEMENT OF FACTS matches the allegations in Counts 5 through 26 of the INDICTMENT.   Bhatti admits that the STATEMENT OF FACTS is correct.   And, Bhatti's criminal conduct is most serious.

Accordingly, at the hearing on March 3, 2026, the Court expressed considerable reluctance to approve the PLEA AGREEMENT with a noncustodial sentence and a fine that could not exceed $10,000.00.   Therefore, the Court directed the parties (ECF No. 59) to file STATEMENTS OF POSITION advising "whether the plea agreement serves the 18 U.S.C. § 3553(a) factors."   Those Statements of Position were filed and the Court has considered them in assessing whether to accept the PLEA AGREEMENT.

## 4. THE STATEMENTS OF POSITION

### A. United States

The principal support for the plea expressed in the POSITION OF THE UNITED STATES seems to be that the PLEA AGREEMENT (and the accompanying STATEMENT OF FACTS):

> ensures that defendant—a pain management physician—will be <u>stripped of his ability to ever again prescribe controlled substances,</u> <u>excluded from billing</u> the United States

---

$500,000 of that amount is jointly owned by Bhatti and his wife.

> Government's <u>Medicaid</u> and <u>Medicare</u> programs, and the now-interim <u>suspension of his medical license</u> will <u>likely turn permanent.</u>  For all intents and purposes, his medical career is over.

(ECF No. 60, p. 1).  That is not all.  The United States also justified the PLEA AGREEMENT, limited to Count 4 and the recommended sentence because of what it referred to as "an atypical factor: that is, defendant's apparently genuine belief that ozone therapies were an effective but untested therapy for pain management."  (ECF No. 60, pp. 3-4)  That, says the United States, "differentiates his case from many of the other health care fraud defendants the United States Attorney's Office confronts."  Also, the United States found significant that Bhatti had no criminal history and that he suffers from poor physical and mental health. In sum, in the view of the United States, the sentence provides adequate deterrence and protection of the public because the conviction "effectively ends defendant's medical career through a variety of means, and eliminates his access to the only atmosphere in which he has committed fraud and used non-approved therapies." (ECF No. 60, p. 5)

The United States also points out that Bhatti faces "high collateral consequences stemming from his plea of guilty."  <u>Id.</u> at 9.  In particular, the United States takes the view that Bhatti will be "collaterally estopped from advancing any claim or defense in later civil litigation that is inconsistent with the Plea

Agreement and the Statement of Facts." Id. That is thought, by the United States, to be significant because there is pending against Bhatti a False Claims Act investigation arising out of the same conduct that is the subject of the INDICTMENT.[4]

The United States also says it has apprehended a significant "litigation risk" based largely on its perception of the risks of a two-week trial involving "dueling expert testimony." In particular, the United States points to proffered testimony of Bhatti's expert who is expected to testify that "ozone therapies were outside the FDA's regulatory authority" and that Bhatti had "appropriately billed nerve blocks" and that "post-injection radiological imaging was medically appropriate." The United States seems to think that such testimony could be persuasive in supporting Bhatti's claim that he had a genuine belief of the medical advocacy of the use of the ozone.

And, the United States noted that certain witnesses had physical and psychological conditions and limitations, all of which presented "not insignificant challenges." That appears to be based on the fact that Bhatti's patients came to him for pain management and therefore were in pain and that they could be impeached on the basis "that they were taking prescription pain

---

[4] Additionally, it is thought by the United States that the collateral estoppel effect of the STATEMENT OF FACTS and the PLEA AGREEMENT will provide a benefit to individual patients who might sue the defendant for malpractice because of the administration of unapproved therapies with or without consent.

11

medications before, during, and after their interactions with defendant."[5]

**B. Bhatti**

The RESPONSE TO POSITION OF THE UNITED STATES (ECF No. 62) by Bhatti agrees with the Government's position. Further, Bhatti says that the Government will not be able to prove Counts 5 through 26. That position relies heavily on the testimony of Bhatti's expert. And, Bhatti's response brief recites several passages of the expert's report. In particular, Bhatti's expert report reflects that he will testify as follows:

> While the ozone generators identified in the indictment were not FDA-cleared for marketing in the United States, their in-office use by a licensed physician falls within the practice of medicine and outside the FDA's enforcement scope. Under 21 U.S.C. § 396, the FDA regulates manufacturers and distributors, not physicians' therapeutic choices. These systems were used as physiologic support tools that deliver controlled ozone-oxygen mixtures aiming to enhance circulation, tissue oxygenation, and recovery, functions analogous to other low-risk adjunctive modalities such as hyperbaric oxygen, infrared therapy, or radio-frequency ablation. Dr. Bhatti's employment of these systems therefore represented a good-faith exercise of medical discretion rather than the commercial distribution or misbranding of medical devices.

---

[5] Of course, Bhatti would have to think long and hard before using that kind of impeachment for it shows callousness in attacking people who came to him in pain seeking help and got medically improper treatment sometimes without informed consent. There is risk to Bhatti for even pursuing that particular line of defense.

12

[T]he government's own materials reference and reproduce written descriptions for the ozone-lidocaine injections, primarily through Dr. Bhatti's website. The presence of these written materials, which set out what the therapy purported to do, shows that descriptive information existing in writing and was publicly available, undermining the allegation that Dr. Bhatti intended to conceal the nature of the treatment from patients. Dr. Lakhan will further testify that, to the extent any additional disclosure was provided verbally during clinical and supported by office materials, the totality of the circumstances reflects transparency· rather than concealment and intent to mislead.

[C]ombining ozone with lidocaine constitutes a form of medical compounding for immediate use, which is governed by state professional regulation, not FDA premarket approval . . . [and] that published medical literature supports ozone's analgesic and anti inflammatory properties and that its use in pain medicine is internationally recognized.

[N]erve-block procedures may properly involve local anaesthetic alone and do not universally require a steroid such as Kenalog to be medically necessary or reimbursable. . . . [A]ny apparent discrepancies between medication inventory and procedural notes do not, by themselves, demonstrate falsification or intent to deceive. . . . [L]isting "Kenalog" in procedural documentation could have reflected a clerical or billing convention rather than a deliberate misrepresentation, particularly if the CPT code corresponded to a nerve block service that does not require a steroid component. [Additionally,] ultrasound guidance, billed under CPT 76942, may reasonably include imaging performed immediately before,·during, or after an injection as part of a continuous protocol ensuring safe needle placement and verifying results.

(ECF No. 62, pp. 3-4).

## 5. POTENTIAL GUIDELINE AND STATUTORY SENTENCES

Having reviewed the STATEMENTS OF POSITION, the charges in the INDICTMENT, the PLEA AGREEMENT, the STATEMENT OF FACTS, and the Presentence Report, the Court asked the Probation Office to assume that Bhatti would have been convicted of the remaining twenty-three counts of the INDICTMENT and to advise what the guideline and statutory maximum sentences would have been in that event.  The response is attached.  The Guideline Range would include a 30-37 month term of imprisonment (against a statutory maximum of 10 years) and a fine range of $10,000.00 to $2,597,001.84, and Restitution of $1,298,500.92.

## ANALYSIS

The PLEA AGREEMENT here is pursuant to Fed. R. Crim. P. 11(c)(1)(B).  And, as that rule permits, the parties have made recommendations respecting the sentence to be imposed.  The Magistrate Judge has advised Bhatti that he has no right to withdraw the plea if the Court does not follow the recommendations or requests made in the PLEA AGREEMENT, see Fed. R. Crim. P. 11(c)(3)(B) and REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE (ECF No. 55).  And, Bhatti has been fully advised as required by Rule 11.

"There is, of course, no absolute right to have a guilty plea accepted."  Santobello v. New York, 404 U.S. 257, 262 (1971).

14

Consequently, "a court may reject a plea in the exercise of sound judicial discretion." Id. Moreover:

> A district court may properly reject a plea agreement based on the court's belief that the defendant would receive too light of a sentence. Under the guidelines, a court is counseled to reject the plea agreement if it determines that accepting the plea agreement will undermine the statutory purposes of sentencing or the sentencing guidelines. Moreover, a court is well-advised to reject a plea agreement that dismisses a charge if it finds that the remaining charges do not adequately reflect the seriousness of the defendant's actual offense behavior.

United States v. Smith, 417 F.3d 483, 487 (5th Cir. 2005).

Here, the STATEMENT OF FACTS and the Presentence Report establish that Bhatti: (1) was involved in an extended health care fraud scheme which: (a) cost the federal health care agencies involved over $1.2 million; (b) deliberately and knowingly purchased, received, and used ozone machines that were not authorized by the FDA; and (c) made a compound drug (ozone and lidocaine) that was not approved by the FDA and then administered that drug to patients, many of whom who did not give informed consent and some of whom suffered great pain; and (2) knowingly and falsely billed the federal health care agencies, Medicare and Medicaid, for the non-approved medical treatments, making false and fraudulent statements in those billings. That conduct went on for more than three years.

15

That is extremely serious, long-term conduct that violates several federal laws.  Yet, the PLEA AGREEMENT permits Bhatti to avoid any prison time, limits the fine that is possible to assess to $10,000.00 (against a maximum fine range of $10,000.00 to over $2.5 million if convicted of the other offenses), and provides for forfeiture of ill-gotten gain in the amount of $91,810.00 when the gain is alleged to be, and stipulated to be, over $1.2 million. That, by any measure, is an insufficient punishment for the criminal conduct that is alleged in the INDICTMENT and to which Bhatti actually has admitted in the STATEMENT OF FACTS.

Considering the seriousness of the offenses, the nature of the health care fraud offenses, the duration of the scheme, and the method of its execution, accepting a plea to Count 4 which recommends no term of confinement, which has a fine limited to $10,000.00, and which does not acknowledge all of the extensive health care fraud misconduct to which Bhatti has admitted in the STATEMENT OF FACTS, and considering that the forfeiture and restitution amounts are considerably less than that which appears to be due, the Court concludes that the PLEA AGREEMENT provides for an unduly lenient sentence and does not meet the objectives of the sentencing statute, 18 U.S.C. § 3533(a), particularly the need for general deterrence and for a sentence that is sufficient but not greater than necessary to achieve the objectives of promoting respect for the law, protecting the public, and deterring others.

16

The parties are correct that some of the measures which are provided in the PLEA AGREEMENT limit the ability of Bhatti to practice medicine or to engage in billing fraud in the future and therefore provide some measure of protection for the public and some quantum of specific deterrence to Bhatti as well as some general deterrence. And, as the parties contend, some measure of leniency is appropriate considering Bhatti's lack of previous criminal history and his health conditions (if that is proven).

However, the Guidelines provide a means to take Bhatti's criminal history into account. And, the Bureau of Prisons has facilities which can treat Bhatti's conditions and the Court can ensure that he is confined in a facility that provides that kind of treatment (and intends to do precisely that). The loss of Bhatti's profession is a serious aspect of punishment but it does not do the work which the parties assign to it: justifying a very lenient punishment for very serious, lengthy criminal conduct.

Finally, the Court recognizes that it is for the trial lawyers to assess the litigation risks provided by the evidence. So, judges should be wary to disregard or discount the assessment that the United States supplies where, as here, it presents that litigation risk as a significant factor in support of a plea agreement. On the other hand, judges are entitled to assess the strength of the reasoning offered by the United States when it relies on this factor. Here, the apprehension of adverse expert

17

witness testimony is something a judge can assess and here the apprehension does not seem well-justified.  Having reviewed the particulars of the expert's testimony, as recited by Bhatti, the Court fails to understand how testimony that has to do with explaining law and legal propositions would be admissible. And some of the expert's testimony is quite speculative (such as that the erroneous entry of one of the drugs referred to in the billing "could have reflected a clerical or billing convention rather than a deliberate misrepresentation."). (ECF No. 62, p. 4)  So, it is difficult to see how such testimony would play a role in the case.

Like the United States, Bhatti points to the passage of time and its effect on the testimony of witnesses.  That, of course, is a facet of witness credibility that is usually considered in assessing the strength of a case.

Bhatti recites the same basic contentions that the United States made and seeks to compare the recommended resolution with other cases.  (ECF No. 62, pp. 7-8) However, those cases do not really seem to be similar to the facts of this one.

To the extent that the United Stats' litigation risk assessment is based on a perceived determination of credibility attributable to the faulty memory of witnesses because of the passage of time, that risk inheres in many cases. It should never

18

be discounted. And, it is for the prosecuting lawyer who has interviewed the witnesses to make that assessment.[6]

Mindful that litigation risk assessment is a matter usually best left to the lawyer who must try the case, the Court leaves that aspect of the assessment in the hands of the prosecutor. And, that is so even though the Court doubts that Bhatti's expert witness testimony (on which both sides seem to rely) would be admissible.[7]

Where then does that leave the analysis as to whether the sentence recommended by the PLEA AGREEMENT is sufficient but not greater than necessary to achieve the objectives of 18 U.S.C. § 3553(a).

To begin, the INDICTMENT charges extremely serious crimes that call for stiff punishment to promote respect for the law among the populace generally and among those who practice medicine and serve as providers under the Medicare and Medicaid programs.

Those who provide services under those programs and who act contrary to their rules do not just violate the law. They violate the trust reposed in them by the governmental agencies (Medicare

---

[6] As previously noted, the fact that witnesses may have been using pain medication is a factor that is fraught with and for both sides. And that assessment is best made by the lawyers who will try the case.

[7] The same is true as to the prosecutor's citation to the "atypical factor" (Bhatti's "genuine belief" as to the efficacy of ozone therapy).

19

and Medicaid), the public, and their patients. In that way, they damage the system that the country has devised to provide affordable healthcare to many of her citizens. .

And, they increase the cost of that healthcare. That, in turn, inflicts further damage to the systems and to those who use those systems - be they providers or patients.

So, those who violate the Medicare and Medicaid rules must be punished significantly to protect the system, the public, and the patients.  And, the punishment must deter the defendant and those in his profession who would be tempted to follow his course in this case.

True the loss of the ability to practice medicine is a form of both punishment and deterrence. But, that loss is not nearly as significant as loss of freedom that attends a prison term.

Nor is the loss of medical privilege as significant when the wrongdoer is left with a significant part of the financial benefits of his wrongdoing. Indeed, if one can accumulate wealth and keep that ill-gotten gain, the sting of the loss of medical privilege is considerably ameliorated.

In this case, by allowing Bhatti to plead to a crime as to which there is a significant limit on the fine that can be imposed and a recommendation for no time in prison, the PLEA AGREEMENT produces a sentence that is not sufficient to protect the public or to promote respect for the law or to deter those who would act

20

as Bhatti has acted. If the Medicare and Medicaid systems are to continue and to achieve their objectives,[8] those who have defrauded the system must be significantly punished.   The PLEA AGREEMENT here does not do that and that failure lends further support to the finding that the PLEA AGREEMENT is too lenient to satisfy the objectives of 18 U.S.C. § 3553(a).

CONCLUSION

For the foregoing reasons, the REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE (ECF No. 55) and the PLEA AGREEMENT will not be accepted. The CONSENT ORDER OF FORFEITURE (ECF No. 56) will be vacated. The case will be set for trial.

It is so ORDERED.

                                    /s/    REP
                          _____
                          Robert E. Payne
                          Senior United States District Judge


Richmond, Virginia
Date: May _19_, 2026

---

[8] Medicare provides comprehensive health care coverage to citizens over 65 and to others who have certain disabilities.  Medicaid provides comprehensive health care coverage for those with limited financial resources.   42 U.S.C. § 1396-1; Social Security Amendments of 1965, Pub. L. 89-97, 79 Stat. 286.

21